1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ALBERT YOUNG,

11              Plaintiff,                    No. CIV S-03-0951 FCD JFM P

12        v.

13   PETER BRESLER, et al.,

14              Defendants.            FINDINGS & RECOMMENDATIONS

15   _____/

16            Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to

17   42 U.S.C. § 1983.  Plaintiff claims that defendants violated his rights under the Eighth

18   Amendment by acting with deliberate indifference to his serious medical needs by failing to

19   timely inform plaintiff of his Hepatitis C infection and treat him for this disease.  Plaintiff also

20   raises pendent state law claims arising from the same set of facts.  This matter is before the court

21   on defendants' motion for summary judgment.

22            SUMMARY JUDGMENT STANDARDS UNDER RULE 56

23            Summary judgment is appropriate when it is demonstrated that there exists "no

24   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

25   matter of law."  Fed. R. Civ. P. 56(c).

26   /////

1

1    Under summary judgment practice, the moving party

2    always bears the initial responsibility of informing the district court
     of the basis for its motion, and identifying those portions of "the
3    pleadings, depositions, answers to interrogatories, and admissions
     on file, together with the affidavits, if any," which it believes
4    demonstrate the absence of a genuine issue of material fact.

5    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

6    nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

7    judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

8    to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

9    after adequate time for discovery and upon motion, against a party who fails to make a showing

10   sufficient to establish the existence of an element essential to that party's case, and on which that

11   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

12   concerning an essential element of the nonmoving party's case necessarily renders all other facts

13   immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

14   whatever is before the district court demonstrates that the standard for entry of summary

15   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

16        If the moving party meets its initial responsibility, the burden then shifts to the

17   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

18   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

19   establish the existence of this factual dispute, the opposing party may not rely upon the

20   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

21   form of affidavits, and/or admissible discovery material, in support of its contention that the

22   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

23   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

24   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

25   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

26   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On September 15, 2003, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

/////

ANALYSIS

I. Facts[1]

From January 18, 1990 through February 4, 1992, plaintiff was an inmate at California State Prison - Corcoran (CSP-Corcoran).  From February 4, 1992 through September 25, 1992, plaintiff was an inmate at the California Men's Colony - East (CMC-E).  From September 25, 1992 through March 1, 2001, plaintiff was an inmate at CSP-Corcoran.  During all relevant times after March 1, 2001, plaintiff was an inmate at Folsom State Prison (FSP).  Defendant Peter Bresler was a physician employed by the California Department of Corrections (CDCR) assigned to CMC-E during the relevant period.  Defendants Rene Iway, Bert Hoffman, Carl Brown, and Brian Yee were physicians employed by the CDCR and assigned to CSP-Corcoran during the relevant period.  Defendant James Sargent was the Laboratory Director of the Corcoran District Hospital, which conducted tests ordered by physicians at CSP-Corcoran, and provided the results, and defendant Agnes Yu-Yuan Wu was the Laboratory Director for the hospital at CSP-Corcoran during the relevant period.  Defendant Marion McArthur was a physician employed by the CDCR and assigned to FSP during the relevant period.  Defendant Carl Wolf was a physician employed by the CDCR and assigned to the Health Services Division, Office of Telemedicine Services in Sacramento during the relevant period.

Plaintiff has been diagnosed with Hepatitis C Virus (HCV).  (Declaration of Simon Jameson, M.D., attached as Exhibit A to Defendants' Statement of Undisputed Facts (DUF), filed June 28, 2004, ¶ 2-3.)  It is currently unknown to the parties how and when plaintiff became infected with HCV.  (Id.)  Plaintiff had a history of intravenous drug use many years prior to incarceration.  (Id.)  On February 15, 1983, an unknown physician, who is not a defendant in this action, completed a CDCR Periodic Health Review form for plaintiff, which stated that plaintiff had a "history of hepatitis or syphilis." (Exhibit 6 to Plaintiff's Statement of

---

[1] Except as otherwise noted, these facts are not in dispute.

Disputed Facts (PDF), filed February 28, 2006.)  On September 15, 1988, another physician, who is not a defendant in this action, ordered general chemistry, liver, and lipid-cardiac risk profiles for plaintiff.  The results showed that plaintiff had elevated levels of asparate aminotransferase (AST) and alanine aminotransferase (ALT), which are enzymes mainly found in the liver.  At that time, plaintiff's AST count was elevated at 46, and his ALT count was elevated at 68. (Plaintiff's PDF Exhibit 7.)

Elevated AST and ALT levels can indicate liver inflammation and possible damage, and persons infected with the hepatitis C virus may have elevated levels of AST and ALT.  (Defendant Bresler's Response to Plaintiff's First Request for Admissions (RPRA), attached as Plaintiff's PDF Exhibit 3, at 5.)  However, the AST and ALT tests cannot definitively identify whether the cause of the elevated levels is due to hepatitis, nor whether the patient is infected with hepatitis A, B, or C.  AST and ALT levels can also be increased by certain medications, strenuous exercise, or injection into muscle tissue. (Defendants' Exhibit A, ¶ 6.) Defendants do not dispute the existence of the 1983 or 1988 documents, nor suggest their absence from plaintiff's medical record during the dates on which any of the defendants treated plaintiff.

On January 19, 1990, at Corcoran-CSP, plaintiff experienced chest pain, and was taken to the medical clinic for emergency treatment.  (Exhibit 9 to Plaintiff's Declaration in Opposition to Defendants' Motion for Summary Judgment (PDO), filed February 28, 2006.) Defendant Iway treated plaintiff by administering "nitro" medication, and ordered that plaintiff be transferred to an outside hospital for observation and treatment.  (Id.)  Defendant Iway noted that "Y. Schuster will be the evaluating M.D."  (Id.)

On February 4, 1992, plaintiff was transferred to CMC-E and defendant Bresler diagnosed plaintiff with hypertension and an upper respiratory infection.  (Plaintiff's PDO Exhibit 14; DUF ¶ 3.)  Defendant Bresler ordered various diagnostic tests, which again revealed an elevated AST count of 51 and an elevated ALT count of 82.  (DUF ¶ 3; Attachment 1 to

1  Defendants' Exhibit A, at 308.)  On February 20, 1992, during a follow up visit, defendant

2  Bresler noted that the other liver function tests in plaintiff's SMA-12 diagnostic were normal,

3  despite the elevated AST and ALT results.  He made no hepatitis diagnosis at this time.  He

4  diagnosed plaintiff with mild leucopenia, and ordered medication.  (DUF ¶ 5; see also

5  Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment (RPO), filed

6  March 7, 2006, at 3.)  On May 22, 1992, defendant Bresler again met with plaintiff for follow up,

7  assessed controlled hypertension, and ordered a thyroid panel that tested essentially normal.

8  (DUF ¶ 8.)  During this time, a hepatitis C test was available and could have been performed;

9  however, no interferon treatment for hepatitis C was available.  (Id. at ¶ 12.)  On September 25,

10  1992 plaintiff was transferred to CSP-Corcoran, and defendant Bresler did not further handle

11  plaintiff's medical care.  (Id. at ¶ 13.)

12        On April 23, 1993, at CSP-Corcoran, plaintiff tested positive for tuberculosis

13  during an annual tuberculosis test.  (Id. at ¶ 14.)  In response, defendant Iway ordered

14  prophylactic therapy for tuberculosis for six months, which included a medication called INH.

15  (Id.)  INH is a drug that can damage the liver and increase AST levels in a patient.  For this

16  reason, defendant Iway also ordered monitoring of AST with laboratory tests.  (Id.; Defendants'

17  Exhibit A, ¶ 14.)  Defendant Sargent was the director of the laboratory at Corcoran District

18  Hospital, which performed the June 18, 1993 and October 26, 1993 tests ordered by defendant

19  Iway.  Defendant Sargent and his staff were responsible for performing the tests and reporting the

20  results to patients' treating physicians, but were not responsible for evaluating patients or

21  prescribing treatment based on test results.  (DUF ¶ 21; Defendant Sargent's Response to

22  Plaintiff's First Set of Interrogatories (RPFI), attached as Defendants' Exhibit D, at 6-7.)

23  Plaintiff began the INH treatment on June 15, 1993.  (DUF ¶ 14.)  A June 18, 1993 test showed

24  that plaintiff had an elevated AST count of 52.  (Id. at ¶ 16.)  On August 2, 1993, defendant Iway

25  transferred to Wasco State Prison and did not further handle plaintiff's medical care.  (Defendant

26  Iway's RPFI, attached as Defendants' Exhibit C, at 4.)

On August 12, 1993, defendant Brown followed up with plaintiff on defendant Iway's ordered tests.  Defendant Brown noted the results of the June 18 test and that, according to the medication sheet in plaintiff's medical record, plaintiff had only received two doses of the INH in June.  (DUF ¶ 17.)  Defendant Brown did not order further blood tests during this time because defendant Iway had ordered the monitoring of plaintiff's liver from the INH medication for tuberculosis, and plaintiff stopped taking the INH on August 17, 1993.  (Id. at ¶ 20; Defendants' Exhibit H, at 9.)  On October 26, 1993, a subsequent test showed plaintiff had an elevated AST count of 70.  (DUF ¶ 20.)

Defendant Hoffman treated plaintiff on July 20, 1994, March 25, 1997, May 1, 1997, and October 9, 1997, for a possible pilonidal cyst, eye irritation, rectal mucus discharge and soiling problems, abdominal pain, and possible thyroid problems.  (Id. at ¶ 24, 30, 32, 35.)  During these visits, defendant Hoffman ordered two thyroid function studies, and referred plaintiff to specialists for his eye and rectal discharge problems.  (Id. at ¶ 32, 35.)  The gastroenterologist, to whom defendant Hoffman had referred plaintiff for his rectal discharge problem, was Dr. Robertson, who has been dismissed as a defendant in this action.[2]  Dr. Robertson treated plaintiff for this problem on November 26, 1997, and, after noting that plaintiff had a prior history of intravenous drug use and a history of liver function abnormalities, he ordered a flexible sigmoidoscopy and a hepatitis C antibody test.  (Id. at ¶ 37.)  The sigmoidoscopy results, dated January 21, 1998, were negative.  There is no record that the hepatitis C test was ever administered.  (Id. at ¶ 38.)

In September 1997, the CDCR issued treatment guidelines for chronic viral hepatitis, including procedures for determining a patient's qualification for treatment.  (Id. at ¶ 34.)  The only known treatment at that time was Interferon Alpha, which was successful in 10 to 15 % of patients, and caused significant side effects.  (Id.)  At the time that Dr. Robertson had

---

[2] The claims against Dr. Robertson were dismissed after his death was suggested on the record.  (See Order filed August 3, 2005.)

ordered the hepatitis C test, Interferon Alpha treatment was available.  (Id. at ¶ 38.) From January 1998 through July 1999, Dr. Robertson and other non-defendant physicians treated plaintiff for a variety of illnesses, including throat and congestion problems, and hypertension.

On July 27, 1999, September 28, 1999, and October 10, 1999, defendant Brown treated plaintiff for hypertension and trigger finger, noting that plaintiff had been without blood pressure medication at times.  (Id. at ¶ 43-45.)  On March 21, 2000, defendant Brown treated plaintiff for trigger finger, referred him to an optometrist for an eye problem, and ordered lab tests, including a test for hepatitis.  Defendant Yee's name appeared as the referring physician on the order for the tests because defendant Yee was the Chief Medical Officer at CSP-Corcoran at that time. (Attachment 1 to Defendant's Exhibit A, at 296.)  Defendant Yee was not plaintiff's treating physician. (Defendant Yee's RPFI, attached as Defendants' Exhibit F, at 11.)  The tests, dated March 25, 2000, showed that plaintiff had an elevated AST count of 53 and an elevated ALT count 55, and the hepatitis panel was positive for hepatitis B core antibody, and hepatitis C AB.  (Id. at ¶ 50-51.)

Defendant Wu was the Director of the laboratory for the hospital at CSP-Corcoran which performed the tests ordered by defendant Brown.  Defendant Wu and her staff were responsible for performing the test and reporting the results to patients' treating physicians, but were not responsible for evaluating patients or prescribing treatment based on test results.  (DUF ¶ 52; Defendant Wu's RPFI, attached as Defendants' Exhibit G, at 3, 4, 6.)

On March 29, 2000, defendant Brown noted that plaintiff had tested positive for the hepatitis C virus (HCV) and had elevated AST and ALT levels.  (Id. at ¶ 53.)  He ordered a PCR viral load test, which determines the number of viral RNA particles per milliliter of blood, and liver function tests (LFTs).  (Id.)  An HCV RNA quantitative test, performed on March 31, 2000, showed plaintiff's viral load to be 354,850 copies/ml (reference range less than 550 copies/ml.)  (Id. at ¶ 54; see also id. at ¶ 76; Attachment 1 to Defendants' Exhibit A, at 297.)  On April 11, 2000, an unknown physician, who is not a defendant in this action, diagnosed plaintiff

with hypertension in poor control, and ordered plaintiff to increase his medication and return to the clinic in a week.  (DUF ¶ 55).  On April 13, 2000, defendant Brown noted the results of the PCR viral load test, and noted that he wanted to meet with plaintiff to discuss a liver biopsy and his possible candidacy for treatment.  (Id. at ¶ 56-57.)  A liver biopsy is a necessary precursor to treatment to determine whether a patient has bridging necrosis or severe cirrhosis, which would exclude the possibility of Interferon treatment.  (Defendants' Exhibit A, ¶ 59.)  Plaintiff did not appear at three subsequent meetings with defendant Brown scheduled for May 8, 2000, May 15, 2000, and May 25, 2000.  (DUF ¶ 57, 58, 59.)

Based on the CDCR treatment guidelines, defendant Brown determined that the poor control of plaintiff's hypertension, his lack of compliance with treatment orders, and his failure to appear for the necessary liver biopsies were criteria which excluded him as a good candidate for treatment at that time.  (Id. at ¶ 62.)  Defendant Brown did not refer plaintiff's case to either the Medical Authorization Review Committee (MAR) or the Health Care Review Committee (HCR).  (Defendant Brown's RPFI, attached as Defendants' Exhibit H, at 8-9.)  Defendant Brown additionally did not, during this time, inform plaintiff either of his hepatitis C positive condition, or that he had been tested for hepatitis.  (PDF at 24-25.)  On March 1, 2001, plaintiff was transferred to FSP. (DUF ¶ 63.)

On March 12, 2001, at FSP, defendant McArthur diagnosed plaintiff with hypertension and possible degenerative disc disease.  (Id. at ¶ 65.)  On July 25, 2001, defendant McArthur treated plaintiff for pain in his left shoulder and arm, diagnosed him with hypertension and possible coronary artery disease, noted that he had not taken his medication for more than 30 days, and ordered "fasting chem and lipid panels" and hypertension medications.  (Id. at ¶ 66.)  The tests showed that plaintiff had an elevated AST count of 56 and an elevated ALT count of 58.  (Id. at ¶ 68.)  Defendant McArthur did not see the results of these tests as follow up was done by another physician Dr. Cardeno, who is not a defendant in this action.  (Id. at ¶ 66.)  Defendant McArthur did not further handle plaintiff's medical care.  From July 27, 2001 through

1   December 3, 2001, Dr. Cardeno and other non-defendant physicians treated plaintiff for various

2   ailments, including his hypertension.  (Id. at ¶ 67-74.)

3           On April 22, 2002 plaintiff met with Dr. Torruella, who is not a defendant in this

4   action.  Dr. Torruella reviewed plaintiff's medical file and informed plaintiff that he had hepatitis

5   C.  Plaintiff told Dr. Torruella that this was the first time he had been so advised.  (Id. at ¶ 75.)

6   At this time, Dr. Torruella ordered medications, an EKG, and tests for liver function, hepatitis C

7   viral count, and hepatitis genotype.  The tests, dated April 24, 2002, showed that plaintiff had an

8   elevated AST count of 68 and an elevated ALT count of 66, his current viral load was 1,712,300,

9   and his HCV genotype was 1a.  (Id. at ¶ 75-76.)  Genotype 1a is the least responsive to treatment.

10  (Defendants' Supplemental Statement of Undisputed Facts in Support of Renewed Motion for

11  Summary Judgment (DSUF), filed December 20, 2005, ¶ 1; Defendants' Exhibit J, at 6.)  On

12  May 8, 2002, Dr. Torruella advised plaintiff that he qualified for HCV treatment, and referred

13  plaintiff to the MAR committee recommending HCV treatment, blood checks, and follow up in

14  one month.  Additionally, at plaintiff's request, Dr. Torruella referred plaintiff to Medical

15  Records to make arrangements for plaintiff to review his medical record.  (Id. at ¶ 77.)

16          On June 27, 2002, plaintiff had a telemedicine consultation with Dr. Jameson,

17  who is not a defendant in this action.  (Id. at ¶ 83.)  Dr. Jameson believed that plaintiff had

18  chronic acute hepatitis C, type 1a, and recommended that combination therapy not be started at

19  that time because the Food and Drug Administration (FDA) approval of combination therapy

20  with pegylated interferon with ribavarin was pending.  (Id.)  The new combination therapy had a

21  higher response rate (35-40 % of patients with genotype 1a)  than the non-pegylated interferon.

22  Plaintiff agreed with this recommendation.  (Id.)  Dr. Jameson ordered a follow up in four

23  months and an ALT test.  (Id.)  On October 7, 2002, plaintiff had his follow up telemedicine

24  consultation with the Internal Medicine Clinic, and his September 19, 2002 ALT test showed an

25  ALT level of 49, which was within normal range.  Another four month follow up appointment

26  and ALT test were scheduled. (Id. at ¶ 84.)  On February 24, 2003, plaintiff met with defendant

1  Wolf for his follow up telemedicine consultation, and his February 3, 2003 ALT showed an

2  elevated ALT count of 57.  At this time, defendant Wolf recommended a liver biopsy to stage the

3  disease.  (Id. at ¶ 85.)

4          Plaintiff initially requested a liver ultrasound instead of a biopsy because he did

5  not want "holes punched in [him]," and on May 23, 2003, defendant Wolf ordered a liver

6  ultrasound.  However, another physician Dr. Sogge, who is not a defendant in this action,

7  explained to plaintiff that an ultrasound would not yield the tissue necessary to determine

8  whether interferon therapy was indicated.  (Id. at ¶ 88-89.)  At that time, plaintiff consented to

9  the liver biopsy, which Dr. Sogge performed on July 21, 2003. The biopsy results showed

10  chronic hepatitis C, grade 2-3, stage 3, and that a "possibility of an evolving cirrhosis may be

11  also considered."  (Id. at ¶ 89, 91; see also Attachment 1 to Defendants' Exhibit A, at 435.)  On

12  September 22, 2003, plaintiff met with an unknown non-defendant physician, who informed

13  plaintiff of the results and ordered liver functions tests, including AST and ALT levels, and a

14  viral load test.  At this time plaintiff's hepatitis C viral load had decreased, without HCV

15  medication or treatment, from 1,712,300 copies/ml to 892,300 copies.  (Id. at ¶ 93-94.)  On

16  November 3, 2003, defendant Wolf saw plaintiff for a telemedicine consultation and began

17  plaintiff's HCV treatment with pegylated interferon, ribavarin, and tylenol.  Defendant Wolf

18  additionally ordered an HCV viral load test to be performed in twelve weeks.  (Id. at ¶ 95.)

19          Defendant Wolf met with plaintiff for follow up telemedic consultations during

20  the HCV treatment on December 22, 2003, and January 5, 2004.  During each visit, defendant

21  Wolf noted that plaintiff was complaining of several side effects from the treatment including

22  fatigue, pain, constipation, decreased concentration, anxiety, and itching, and he treated plaintiff

23  accordingly for these side effects.  (DUF ¶ 96-97.)  On February 6, 2004, defendant Wolf met

24  with plaintiff for the twelve-week follow up.  Defendant Wolf noted that, according to January

25  30, 2004 lab test results, plaintiff's viral load count had decreased from 892,300 copies/ml when

26  he began treatment, to 70,970 copies/ml and 96,810 copies/ml on two different tests.  (Id. at ¶ 98;

see also Attachment 1 to Defendants' Exhibit A, at 267.)  Because plaintiff still had a detectable

viral load count and the drop in the count was less than a 100 fold (2 log) drop, which would

have been 8,923 copies/ml, defendant Wolf considered the treatment to be a failure.  (DUF ¶ 98;

Defendant Wolf's RPFI, attached as Defendants' Exhibit J, at 6-7.)  As a result of this, and

because plaintiff was experiencing side effects associated with the treatment, defendant Wolf

discontinued the treatment.  (Defendant's Exhibit J, at 6-7.)

II.  Plaintiff's Claims

    A.  Eighth Amendment[3]

       In order to prevail on his Eighth Amendment claim, plaintiff must prove that he

had a "serious medical need" and that defendants acted with "deliberate indifference" to that

need.  Estelle v. Gamble, 429 U.S. 97, 105 (1976).  A medical need is serious if  "the failure to

treat a prisoner's condition could result in further significant injury or the 'unnecessary and

wanton infliction of pain'."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992) (quoting

Estelle, 429 U.S. at 104, 97 S.Ct. 285).  Deliberate indifference is proved by evidence that a

prison official "knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of the facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837

(1994).  Mere negligence is insufficient for Eighth Amendment liability.  See Frost v. Agnos, 152

F.3d 1124, 1128 (9th Cir. 1998).

       Whether a defendant had requisite knowledge of a substantial risk is a question of

fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact

that the risk was obvious.  See Farmer, 511 U.S. at 842.  While the obviousness of the risk is not

conclusive, a defendant cannot escape liability if the evidence shows that the defendant merely

---

[3] This action is proceeding on plaintiff's amended complaint, filed May 19, 2004. Plaintiff refers to the Fifth Amendment in the amended complaint.  However, the Fifth Amendment is not implicated by the facts of this case.

1  refused to verify underlying facts or declined to confirm inferences that he strongly suspected to

2  be true.  Id.  Deliberate indifference specifically to medical needs "may be shown by

3  circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually

4  knew of a risk of harm."  Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003).

5        "Prison officials are deliberately indifferent to a prisoner's serious medical needs

6  when they deny, delay, or intentionally interfere with medical treatment."  Hallett v. Morgan, 296

7  F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted).  However, delay

8  in providing medical treatment to a prisoner does not constitute deliberate indifference unless the

9  delay causes substantial harm.  See Shapely v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404,

10  407 (9th Cir. 1985).  Additionally, "a plaintiff's showing of nothing more than 'a difference of

11  medical opinion' as to the need to pursue one course of treatment over another [is] insufficient,

12  as a matter of law, to establish deliberate indifference."  Jackson v. McIntosh, 90 F.3d 330, 332

13  (9th Cir. 1996) (as amended) (1996).

14        All defendants seek summary judgment on the ground that there is no evidence

15  that any of them responded with deliberate indifference to plaintiff's HCV infection or medical

16  needs following therefrom.  There is no dispute that plaintiff's HCV infection constituted a

17  serious medical need.  Defendants Drs. Bresler, Iway, Hoffman, Yee, and McArthur contend that

18  they were not deliberately indifferent to plaintiff's HCV infection because the information they

19  had did not demonstrate facts sufficient to suggest that plaintiff might be infected with HCV.

20  Additionally, defendants Bresler, Iway, Hoffman, Yee, and McArthur contend that, even if the

21  record did indicate HCV, any delay in diagnosis or treatment did not cause plaintiff the requisite

22  substantial harm because his subsequent treatment failed.  Defendants Drs. Sargent and Wu

23  contend that they were not deliberately indifferent to plaintiff's HCV infection because they

24  fulfilled their responsibilities by conducting laboratory tests ordered by plaintiff's treating

25  physicians, and reporting the results back to those physicians.  Defendant Dr. Brown contends

26  that, though he had actual knowledge of plaintiff's HCV infection, he was not deliberately

indifferent to plaintiff's health because he attempted to meet with plaintiff.  Defendant Brown

also contends that any delay in diagnosis or treatment did not cause plaintiff substantial harm

because his subsequent treatment failed.  Defendant Dr. Wolf contends that, though he had actual

knowledge of plaintiff's HCV infection, he did not disregard plaintiff's health because he treated

plaintiff, and that plaintiff's difference of opinion with his decision to terminate the treatment is

insufficient to establish deliberate indifference.

    1.  Defendant Dr. Bresler

        Plaintiff claims that defendant Bresler acted with deliberate indifference to his

serious medical need when defendant Bresler failed to diagnose and inform plaintiff of his HCV

infection in 1992.  The undisputed evidence shows that defendant Bresler treated plaintiff on

February 4, 1992 for hypertension and a urinary tract infection, and that as part of that care,

plaintiff's blood tests showed elevated levels of AST and ALT.  Defendant Bresler did not

diagnose HCV at that time.

        In order to state a claim of deliberate indifference against defendant Bresler,

plaintiff must be able to demonstrate both that defendant Bresler was aware of facts from which

the inference could be drawn that plaintiff might be infected by HCV, and that defendant Bresler

either drew this inference or declined to confirm an inference that he strongly suspected.  See

Farmer, 511 U.S. at 837, 842.  Defendant Bresler contends that he ordered the February 4, 1992

AST and ALT tests as part of the routine care of hypertension.  (Defendant Bresler's RPFI,

attached as Exhibit B, at 11.)  Defendant Bresler also contends that, while the elevated AST and

ALT levels could indicate a liver disorder or hepatitis, he did not diagnose hepatitis C at that time

because plaintiff's other liver function tests were normal, plaintiff had no symptoms indicative of

hepatitis, and plaintiff's medical records at that time did not indicate any symptoms specific for

hepatitis.  (Defendants' RPO, at 3; DUF ¶ 14.)  Defendant Bresler has also provided a declaration

from Dr. Jameson, unrefuted by plaintiff, stating that the treatment he provided was within the

standard of care for HCV at the time that he treated plaintiff.  (Defendants' Exhibit A, ¶ 14.)

1    Plaintiff has submitted evidence, not disputed by defendants, that in 1992 his

2  medical record contained at least two documents indicating the potential for hepatitis, the 1983

3  Periodic Health Review showing that plaintiff had a "history of hepatitis or syphilis," and the

4  1998 lab results, showing elevated AST and ALT levels.  (Plaintiff's PDF Exhibits 6, 7.)

5  Additionally, defendant Bresler admitted that he knew on February 20, 1992, that plaintiff had

6  elevated ALT and AST levels, based on the February 4, 1992 lab tests that he had ordered, and

7  that plaintiff's elevated levels could indicate chronic hepatitis and liver inflammation.

8  (Defendants' Exhibit B, at 8, 11; see also Plaintiff's PDF Exhibit 3, at 5.)  Plaintiff claims that

9  these documents in his file should have been sufficient to put defendant Bresler on notice of his

10  HCV infection.

11    However, it is undisputed that defendant Bresler ordered the tests in order to

12  monitor plaintiff's hypertension which he had diagnosed, not to test for HCV.  (Defendants'

13  Exhibit B, at 11.)  Additionally, the 1983 Periodic Health Review was not a prior diagnosis of

14  hepatitis, but rather a statement that he had a "history of hepatitis or syphilis," and plaintiff

15  provided no evidence showing the medical history on which the statement was based.  Moreover,

16  in 1992, at the time that defendant Bresler was treating plaintiff, the 1997 CDCR guidelines on

17  the treatment of hepatitis had not yet been released, and the interferon treatment for HCV did not

18  yet exist.  Plaintiff's evidence is insufficient to create a triable issue of material fact as to whether

19  defendant Bresler knew or strongly suspected that plaintiff could be infected with HCV.  After

20  careful review of the record herein, this court finds no evidence that any failure by defendant

21  Bresler to diagnose plaintiff's HCV infection in 1992 was caused by deliberate indifference to

22  plaintiff's serious medical needs.  See Frost, 152 F.3d at 1128.

23    Furthermore, the court finds that plaintiff suffered no cognizable harm from any

24  failure to diagnose hepatitis C in 1992.  Unless a delay or denial of medical treatment for a

25  prisoner causes the prisoner to suffer substantial harm, a claim of deliberate indifference must

26  fail.  See Shapley, 766 F.2d at 407.  It is undisputed that plaintiff could not have begun treatment

15

1   in 1992 because the interferon treatment for HCV did not yet exist.  Plaintiff did provide articles

2   written in 1999 and 2003 explaining the benefits of early detection, however there is no evidence

3   that this information was available in 1992.  (Plaintiff's PDF Exhibits 8, 9.)  There is no evidence

4   that an HCV diagnosis in 1992 would have resulted in any difference in plaintiff's medical care

5   at that time.  Plaintiff's evidence is insufficient to create a triable issue of material fact as to

6   whether defendant Bresler's delay in diagnosing plaintiff's HCV virus caused plaintiff

7   substantial harm.

8          Based on the foregoing reasons, after careful review of the entire record herein,

9   the court finds no evidence that defendant Bresler was deliberately indifferent to plaintiff's

10   serious medical needs.  Defendant Bresler is therefore entitled to summary judgment on

11   plaintiff's Eighth Amendment claim.

12          2. Defendant Dr. Iway

13          Plaintiff claims that defendant Iway acted with deliberate indifference to his

14   serious medical need when defendant Iway failed to diagnose and inform plaintiff of his HCV

15   infection in 1993.  It is undisputed that defendant Iway ordered the AST tests, which were

16   conducted on June 18, 1993, and October 26, 1993, in order to monitor plaintiff's AST level

17   during his tuberculosis treatment.  (Defendant's Exhibit C, at 9.)  It is also undisputed that

18   defendant Iway did not view the results of these tests because he was transferred to WSP on

19   August 2, 1993, and defendant Brown followed up on the results of the June 18 and October 26

20   tests.  (Id. at 11.)

21          In order to state a claim of deliberate indifference against defendant Iway, plaintiff

22   must be able to demonstrate both that defendant Iway was aware of the facts from which the

23   inference could be drawn that plaintiff was infected by HCV, and that defendant Iway either drew

24   this inference or declined to confirm an inference that he strongly suspected.  See Farmer, 511

25   U.S. at 837, 842.  Defendant Iway contends that, in April 1993, he provided appropriate therapy

26   for plaintiff's tuberculosis, but that he did not test for or diagnose HCV because plaintiff's

16

1   medical record contained no evidence of this condition.  (Defendants' Exhibit C, at 11.)  Plaintiff

2   contends that, because defendant Iway ordered the June 18, 1993 and October 26, 2993 AST

3   tests, which revealed elevated AST levels that could be indicative of hepatitis, and because of the

4   presence of the 1983 Periodic Health Review and the 1988 lab reports in his file, defendant Iway

5   knew of and disregarded plaintiff's HCV infection.  However, plaintiff provides no evidence to

6   contradict defendant Iway's statements that he ordered the AST monitoring in response to the

7   INH treatment for tuberculosis, rather than for hepatitis, or that defendant Iway's connection to

8   plaintiff's medical care did not extend beyond this initial response to plaintiff's tuberculosis.

9   Plaintiff's evidence also does not contradict defendants' assertion that, after defendant Iway's

10  transfer, defendant Brown, not defendant Iway, was responsible for the follow up with plaintiff

11  regarding the June 18, 1993, and October 26, 1993 tests.

12          Plaintiff also contends that, because defendant Iway treated plaintiff in January

13  1990, he became familiar with plaintiff's case so that, when he prescribed the tuberculosis

14  treatment for plaintiff in April 1993, he must have known of the risk that plaintiff was infected

15  with HCV.[4]  (PDF ¶ 14.)  However, the record reflects that, in January 1990, defendant Iway's

16  only contact with plaintiff was to provide immediate treatment and medication during an

17  emergency situation, and transfer him to an outside hospital for observation and treatment.

18  (Plaintiff's PDO Exhibit 9.)  Plaintiff provided no evidence that defendant Iway had any other

19  contact with him or his medical record before prescribing the tuberculosis treatment and

20  monitoring in April 1993.  Plaintiff's evidence is insufficient to show that defendant Iway's brief

21  contact with plaintiff in January 1990 could have rendered defendant Iway sufficiently familiar

22  with plaintiff's health history that his failure to diagnose plaintiff with HCV, while treating him

23  for tuberculosis in April 1993, might be the product of deliberate indifference.  After careful

24

25      [4]  Plaintiff's complaint against defendant Iway was based on defendant Iway's actions in
    April 1993, and not on defendant Iway's treatment of plaintiff in January 1990. (Plaintiff's
26  Amended Compl. ¶ 5, 6, 10.)

                                        17

1  review of the entire record herein, the court finds no evidence that defendant Iway's failure to

2  diagnose plaintiff's HCV infection was the result of deliberate indifference.  Defendant Iway is

3  therefore entitled to summary judgment on plaintiff's Eighth Amendment claim.

4                      3.  <u>Defendant Dr. Hoffman</u>

5            Plaintiff claims that defendant Hoffman acted with deliberate indifference to his

6  serious medical need when defendant Hoffman failed to diagnose and treat his HCV infection in

7  1994 or 1997.  It is undisputed that defendant Hoffman met with plaintiff for eye pain and rectal

8  mucus problems and referred him to specialists for these problems.  (DUF ¶ 32, 35.)  All tests

9  ordered by defendant Hoffman were for thyroid evaluation and would not have revealed HCV or

10 elevated levels of AST and ALT.  Defendant Hoffman did not diagnose or treat plaintiff for HCV

11 nor refer plaintiff to a specialist or to the MAR or HCR committees for evaluation of HCV.

12           In order to state a claim of deliberate indifference against defendant Hoffman,

13 plaintiff must be able to demonstrate both that defendant Hoffman was aware of the facts from

14 which the inference could be drawn that plaintiff was infected by HCV, and that defendant

15 Hoffman either drew this inference or declined to confirm an inference that he strongly

16 suspected.  <u>See</u> <u>Farmer</u>, 511 U.S. at 837, 842.  Defendant Hoffman contends that his visits with

17 plaintiff on July 20, 1994, March 25, 1997, May 1, 1997, and October 9, 1997, were primarily for

18 complaints of rectal discharge and possible thyroid problems, and that he ordered the tests for

19 plaintiff on July 20, 1994, and March 25, 1997, to evaluate plaintiff's thyroid.  (DUF ¶ 35;

20 Defendants' Exhibit E, at 9.)  He asserts that these tests could not have diagnosed liver problems

21 or hepatitis.  (Defendant's Motion for Summary Judgment, filed July 28, 2004, at 10.)  Defendant

22 Hoffman contends that he did not diagnose or treat plaintiff's HCV, or refer him to the MAR or

23 HCR committees because "[t]here was no evidence in the medical records that [plaintiff] was

24 infected with hepatitis C."  (Defendants' Exhibit E, at 9.)  Finally, defendant Hoffman argues

25 that, even if he had known of plaintiff's HCV infection, because plaintiff's subsequent 2002

26 /////

1  HCV treatment failed plaintiff suffered no cognizable harm from any failure to diagnose hepatitis

2  C in 1994 or 1997.  (Defendants' RPO, at 3-4.)

3         As noted in section I, <u>supra</u>, plaintiff submitted evidence, not disputed by

4  defendants, that by 1997 his medical record contained at least five documents, the 1983 Periodic

5  Health Review, the 1998 lab results, the February 1992 test results, the June 1993 test results,

6  and the October 1993 test results, which indicated that plaintiff had elevated AST and ALT

7  levels and a possible history of hepatitis.  (Plaintiff's Exhibits 6, 7; Attachment 1 to Defendants'

8  Exhibit A, at 308; DUF ¶ 16, 20.)  These documents contradict defendant Hoffman's assertion

9  that plaintiff's medical record contained no evidence of hepatitis.  However, while plaintiff

10  claims that these documents in his file should have been sufficient to put defendant Hoffman on

11  notice of his HCV infection, it is undisputed that the four recorded visits between defendant

12  Hoffman and plaintiff were all for the treatment of unrelated illness, and that the tests that

13  defendant Hoffman ordered would not have indicated any symptoms of an HCV infection.

14  Additionally, the CDCR did not issue its guidelines regarding the treatment of prisoners infected

15  with HCV until September 1997, one month before plaintiff's last recorded visit with defendant

16  Hoffman.  Plaintiff also contends that the illnesses for which defendant Hoffman treated him in

17  1994 and 1997 were some of the main symptoms of and HCV infection, however he provides no

18  evidence to support this assertion.  Plaintiff has not provided sufficient evidence for a reasonable

19  jury to conclude that the facts available to defendant Hoffman in 1994 and 1997 would create a

20  strong suspicion that plaintiff was infected with HCV.  Based on the facts that were available at

21  the time defendant Hoffman treated plaintiff, the court finds that defendant Hoffman's failure to

22  diagnose plaintiff's HCV infection constituted at most negligence, which does not rise to the

23  level of deliberate indifference.  <u>See</u> <u>Frost</u>, 152 F.3d at 1128.

24         After careful review of the entire record herein, the court finds no evidence that

25  defendant Hoffman acted with deliberate indifference to plaintiff's possible HCV infection.

26  /////

1 Defendant Hoffman is therefore entitled to summary judgment on plaintiff's Eighth Amendment

2 claim.

3          4. Defendant Dr. Brown

4          Plaintiff claims that defendant Brown acted with deliberate indifference to his

5 serious medical need when defendant Brown failed to diagnose his HCV infection in 1993, and

6 failed to inform him of his infection and provide treatment after his positive test result in 2000.

7 It is undisputed that on August 12, 1993, defendant Brown noted plaintiff's elevated AST levels

8 on the June 18, 1993 test, and that plaintiff had only had two doses of his INH medication which

9 began on June 15, 1993.  (DUF ¶ 17.)  It is also undisputed that, on March 29, 2000, defendant

10 Brown expressly noted plaintiff's HCV positive results, but that, after noting plaintiff's missed

11 appointment on March 25, 2000, defendant Brown did not take any additional measures to

12 inform plaintiff of his HCV positive condition, did not pursue any further course of treatment for

13 plaintiff's HCV infection, and did not refer plaintiff to the MAR or HCR committees for

14 evaluation of his HCV.  (Defendants' Exhibit A, ¶ 55.)  An interferon treatment with a success

15 rate of approximately 20% was available at this time.  (Id.)

16          In order to state a claim of deliberate indifference against defendant Brown for his

17 failure to diagnose HCV on August 12, 1993, plaintiff must be able to demonstrate both that

18 defendant Brown was aware of facts on August 12, 1993 from which the inference could be

19 drawn that plaintiff was infected by HCV, and that defendant Brown either drew this inference or

20 declined to confirm an inference that he strongly suspected.  See Farmer, 511 U.S. at 837, 842.

21 Defendants do not dispute the presence in plaintiff's medical record, on August 12, 1993, of the

22 1983 Period Health Review Report or the lab reports showing elevated AST and ALT levels.

23 However, as noted with defendants Bresler, Iway, and Hoffman, plaintiff provided no evidence

24 that the facts available to defendant Brown on August 12, 1993 were sufficient to create a strong

25 suspicion of HCV.  Based on the facts that were available at the time defendant Brown treated

26 plaintiff, the court finds that defendant Brown's failure to diagnose plaintiff's HCV infection on

August 12, 1993 constituted at most negligence, which does not rise to the level of deliberate indifference.  See Frost, 152 F.3d at 1128.

Because it is undisputed that defendant Brown had actual subjective knowledge of plaintiff's HCV positive condition on March 29, 2000, the only issues in dispute after that date are whether defendant Brown's delay of treatment constituted deliberate indifference to plaintiff's HCV infection, and whether any cognizable harm accrued to plaintiff as a result of this delay.  Defendant Brown admitted that the standard practice at this time when a patient tested positive for HCV was to conduct additional testing and review various factors to determine whether the patient might be a candidate for treatment.  (Defendants' Exhibit H, at 12.)  However, he contends that he was not deliberately indifferent to plaintiff's HCV infection because he attempted to schedule three appointments with plaintiff on May 8, May 15, and May 25, 2000, to discuss the results and the need for a liver biopsy.  (DUF ¶ 56-59.)  Defendant Brown additionally contends that he subsequently determined that plaintiff was not a good candidate for treatment based on his hypertension in poor control, his failure to follow previous treatment orders, and his failure to appear for the necessary liver biopsy to assess his candidacy.  (Id. at ¶ 62.)  Defendant Brown adds that he did not refer plaintiff's case to the MAR or HCR committees because plaintiff did not appear at the three appointments.  (Defendants' Exhibit H, at 9.)

Plaintiff contends that defendant Brown never informed him of the purpose for his missed appointments, nor that he had ordered the hepatitis tests or that the results had indicated that plaintiff was HCV positive.  (PDF at 24-25.)  Plaintiff also contends that almost a full year passed between March 29, 2000, the date that defendant Brown first noted that plaintiff was infected with HCV, and March 1, 2001, the date that plaintiff was transferred to FSP, during which defendant Brown could have notified or treated plaintiff.  (Id. at 25.)  Defendant Brown does not dispute these contentions.  Additionally, it is undisputed that defendant Brown failed to conduct any additional testing after plaintiff's missed appointments to determine whether

1   plaintiff might be a candidate for treatment, as per the admitted standard practice at that time.

2   (Defendants' Exhibit H, at 10, 12.)  While defendant Brown contends that he determined that

3   plaintiff was not a good candidate for treatment, this argument is belied by the fact that, based on

4   the same information, Dr. Torruella subsequently determined that plaintiff was a good candidate

5   for interferon treatment, and referred plaintiff's case to the MAR committee for evaluation.

6   (Defendants' Exhibit A, ¶ 79.)  A reasonable jury could conclude that defendant Brown's failure

7   to inform plaintiff and persist in following up regarding his HCV infection, and his failure to

8   refer the case to the MAR or HCR committees for evaluation, constituted deliberate disregard of

9   a known risk to plaintiff's health.  Therefore, the court finds that triable issues of material fact

10  exist as to whether defendant Brown's delay in providing medical treatment for plaintiff's HCV

11  infection constituted deliberate indifference to plaintiff's serious medical need.  See Hallett v.

12  Morgan, 296 F.3d 732, 744 (9th Cir. 2002).

13          Defendant Brown also contends that the subsequent failure of plaintiff's treatment

14  beginning in November 2003 was a function of his genotype and that the timing of treatment was

15  irrelevant to the failure; therefore no cognizable harm accrued to plaintiff from any delay in

16  treatment from March 2000 to November 2003.  However, plaintiff has provided an article

17  published in 1999, which stated, "HCV is able to evade the immune system and stay in the body

18  for years, slowly destroying liver cells ... [i]f infected persons are identified early, they can

19  receive treatment and possibly avoid permanent liver damage."  (Plaintiff's PDF Exhibit 9, at 6.)

20  Additionally, the defendants expressly stated that, with plaintiff's genotype 1a, the higher the

21  viral load in the patient's blood, the poorer the virus responds to treatment.  (DSUF ¶ 1.)

22  According to the medical record, plaintiff's viral load count increased from 354,850 copies/ml, at

23  the time of defendant Brown's HCV positive diagnosis on March 29, 2000, to 892,300 copies/ml

24  when plaintiff began his interferon treatment in November, 2003.[5]  (DUF ¶ 54, 94; see also

25  ─────────────

26  [5] The defendants also contend that viral loads can fluctuate, going up or down irrespective
    of treatment, and do not necessarily move from lower to higher levels.  (Defendants' Exhibit J, at

1   Attachment 1 to Defendants' Exhibit A, at 93, 297.)  Based on the above facts, a reasonable jury

2   could conclude that the delay in diagnosis allowed for the substantial increase in plaintiff's viral

3   load before he received treatment, and that this may have contributed to the poor response.

4   Plaintiff's evidence is sufficient to create a triable issue of material fact as to whether defendant

5   Bresler's delay in treating plaintiff's HCV infection in 2000 caused plaintiff substantial harm.

6          Based on the foregoing reasons, after a careful review of the entire record herein,

7   the court finds that genuine issues of material fact exist with plaintiff's claim against defendant

8   Brown.  Defendant Brown is therefore not entitled to summary judgment.

9          5. Defendant Dr. McArthur

10          Plaintiff claims that defendant McArthur acted with deliberate indifference to his

11   serious medical need when defendant McArthur failed to inform him of his HCV infection and

12   provide treatment in 2001.  It is undisputed that defendant McArthur treated plaintiff on March

13   12, 2001, and July 25, 2001, and that plaintiff's medical record at this time contained the results

14   of the March 21, 2000 test showing that plaintiff was HCV positive.  The record also shows that

15   defendant McArthur did not inform plaintiff of his HCV positive condition, did not pursue any

16   course of treatment for plaintiff's HCV infection, and did not refer plaintiff to the MAR or HCR

17   committees for evaluation of his HCV.

18          In order to state a claim of deliberate indifference against defendant McArthur,

19   plaintiff must be able to demonstrate that defendant McArthur was aware of the facts from which

20   the inference could be drawn that plaintiff was infected by HCV, and that she drew this inference

21   or declined to confirm an inference that she strongly suspected.  See Farmer, 511 U.S. at 837,

22   842.  Defendant McArthur contends that on March 12, 2001, and July 25, 2001, she treated

23   plaintiff for uncontrolled hypertension, a possible degenerative disc disease, and a possible

24

25   6.)  The medical record does reflect that plaintiff's viral load decreased without treatment from
     1,712,300 in April 2002 to 892,300 in September 2003, which supports defendant's assertion.
26   (DUF ¶ 76, 94.)

1    coronary artery disease, which are not related to plaintiff's HCV infection.  (DUF ¶ 65, 66.)

2    Defendant McArthur also contends that, although she ordered the lab tests on July 25, 2001,

3    which indicated elevated levels of AST and ALT, she never saw the results of these tests because

4    plaintiff was seen for follow up by another physician.  (Defendants' Exhibit I, at 9-10.)   The

5    presence of the March 21, 2000 HCV positive test result in plaintiff's medical record serves as

6    circumstantial evidence of defendant McArthur's subjective knowledge of plaintiff's HCV

7    infection.  Additionally, defendant McArthur admitted that, at the time that she treated plaintiff,

8    when an inmate tested positive for HCV, further testing should be done to determine whether that

9    inmate is eligible for treatment.  (Defendant McArthur's RPFI, attached as Defendants' Exhibit I,

10   at 11.)  Because defendant McArthur took no action toward further testing or treating plaintiff's

11   HCV infection, a reasonable jury could conclude that defendant McArthur delayed medical

12   treatment for a known risk to plaintiff's health.   Plaintiff's evidence is sufficient to create a

13   triable issue of fact as to whether defendant McArthur was subjectively aware of plaintiff's HCV

14   infection, and whether her failure to inform plaintiff of his infection or pursue any course of

15   evaluation or treatment constituted deliberate indifference to plaintiff's serious medical need.

16   See Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002).

17          Defendant McArthur also contends that the subsequent failure of plaintiff's

18   treatment beginning in November 2003 was a function of his genotype and that the timing of

19   treatment was irrelevant to the failure; therefore no cognizable harm accrued to plaintiff from any

20   delay in treatment from July 2001 to November 2003.  (Defendants' Motion for Summary

21   Judgment, filed June 28, 2004, at 12.)  However, as discussed in section III(A)(4), supra, plaintiff

22   provided evidence from which a reasonable jury could conclude that a timely diagnosis and

23   immediate treatment could have prevented additional harm, and that the delay in diagnosis and

24   treatment may have contributed to the subsequent failure of that treatment.  Plaintiff's evidence is

25   sufficient to create a triable issue of material fact as to whether defendant McArthur's delay in

26   /////

pursuing further testing or treatment for plaintiff's HCV infection on March 12, 2001, and July 25, 2001, caused plaintiff substantial harm.

Based on the foregoing reasons, after a careful review of the entire record herein, the court finds that genuine issues of material fact exist with plaintiff's claim against defendant McArthur.  Defendant McArthur is, therefore, not entitled to summary judgment.

### 6. Defendants Dr. Sargent, Dr. Wu, and Dr. Yee

Plaintiff claims that defendants Sargent, Wu, and Yee acted with deliberate indifference to his serious medical needs because their names appeared on various medical documents connected with plaintiff's HCV infection, but they failed to diagnose or provide treatment for his HCV infection.  It is undisputed that defendant Sargent was the Laboratory Director at Corcoran District Hospital, and that he and his staff were responsible for conducting the tests ordered by defendant Iway on June 18, 1993, and October 26, 1993, and reporting the results back to plaintiff's treating physician.  (Defendants' Exhibit D. at 6-7.)  Likewise, it is undisputed that defendant Wu was the Laboratory Director of the laboratory at the hospital of CSP-Corcoran, and she and her staff were responsible for conducting the tests ordered by defendant Brown on March 21, 2000, and March 29, 2000, and reporting the results back to defendant Brown.  (Defendants' Exhibit G, at 3, 4, 6; Defendants' Exhibit A, ¶ 54.)  The evidence also shows that defendant Yee was the Chief Medical Officer of CSP-Corcoran in March 2000, and that defendant Yee's name appeared as the referring physician on the March 25, 2000 lab report for the test ordered by defendant Brown (DUF ¶ 51; Attachment 1 to Defendants' Exhibit A, at 296.)  It is undisputed that defendant Brown was the doctor who ordered these tests.  (See POM ¶ 14, stating "[O]n March 21, 2000, defendant Brown ordered that plaintiff be tested for the hepatitis virus.")

Defendants Sargent and Wu contend that they were not deliberately indifferent to plaintiff's HCV because, as laboratory directors, they had no responsibility for patient care beyond properly conducting ordered tests and correctly reporting the results to the treating

1  physician, and because the ordering physician is responsible for evaluating the patient's medical

2  needs in light of the test results.  (Defendants' Exhibit 6, at 6-7; Defendants' Exhibit A, ¶ 54.)

3  Plaintiff provided no evidence to dispute these facts.  After careful review of the entire record

4  herein, the court finds no evidence that defendants Sargent or Wu responded to plaintiff's needs

5  with deliberate indifference.  To the contrary, defendants Sargent and Wu fulfilled their

6  responsibilities to plaintiff by conducting the tests ordered by defendants Iway and Brown, and

7  reporting the results to those tests back to plaintiff's treating physicians.  (Id. at 7.)

8       Defendant Yee contends that he did not respond to plaintiff's HCV infection with

9  deliberate indifference because he was not plaintiff's treating physician, and it was defendant

10  Brown who ordered the tests and was responsible for following up with plaintiff.  (Defendants'

11  Exhibit F, at 9.) Defendant Yee also contends that his name only appeared as the referring

12  physician only because he was the Chief Medical Officer of CSP-Corcoran at that time.[6]

13  (Defendants' Exhibit F, at 9; Attachment 1 to Defendants' Exhibit A, at 296.)  Plaintiff provided

14  no evidence demonstrating that defendant Yee had any contact with plaintiff's care or medical

15  record, other than his name appearing on the lab report by merit of his position as Chief Medical

16  Director.  After careful review of the entire record herein, the court finds no evidence that

17  defendant Yee responded to plaintiff's medical needs with deliberate indifference.

18       For the foregoing reasons, defendants Sargent, Wu, and Yee are entitled to

19  summary judgment on plaintiff's Eighth Amendment claim.

20       6. Defendant Dr. Wolf

21       Plaintiff claims that defendant Wolf acted with deliberate indifference to his

22  serious medical need when defendant Wolf terminated the interferon medication for his HCV

23  infection.  Defendant Wolf contends that his decision to discontinue plaintiff's treatment was

24  /////

25

26       [6] The March 25, 2000 lab report states "Comments: Copy to Dr. Brown," which supports
defendant Yee's assertion.  (Attachment 1 to Defendants' Exhibit A, at 296.)

1    based on his medical assessment that plaintiff's treatment had failed, and did not constitute

2    deliberate indifference.  (Defendants' Exhibit J, at 7.)

3           It is undisputed that defendant Wolf ordered plaintiff's interferon treatment for

4    HCV on November 3, 2003, and met with plaintiff on December 22, 2004, January 5, 2004, and

5    February 6, 2004, for follow up visits.  It is also undisputed that defendant Wolf terminated

6    plaintiff's treatment on February 6, 2004.  Additionally, the record shows that plaintiff

7    experienced several side effects from the treatment including fatigue, pain, constipation,

8    decreased concentration, anxiety, and itching.  Defendant Wolf contends that current medical

9    evidence indicates that, if treatment is non-responsive after twelve weeks, there is little or no

10   chance that further treatment will be successful and the treatment is discontinued because the

11   serious side effects of combination therapy outweigh any probability of success.  (Defendants'

12   Exhibit J, at 6-7.)  Defendant Wolf contends that, because plaintiff's viral load count had not

13   decreased by 100 fold (2 log drop) and plaintiff was experiencing significant side effects from the

14   interferon, he considered the treatment to be a failure and discontinued plaintiff's treatment.  (Id.,

15   at 7.)

16          Plaintiff contends that the decision to terminate his treatment constituted

17   deliberate indifference.  Plaintiff points to the evidence that his viral load count dropped with

18   treatment from 892,300 copies/ml to 96,810 copies/ml, and he avers that he was not feeling too

19   badly as a result of the side effects.  (Id.)  Plaintiff alleges that defendant Wolf's decision to

20   terminate his treatment was motivated by cost.[7]  (Id. at ¶ 42.)  However, plaintiff provides no

21

22          [7] Plaintiff alleges that an unidentified nurse told him that treatment of all HCV infections
     in prisoners would "break the bank" of the CDCR and that many persons feel that prisoners do
23   not deserve the same medical care as free citizens, however plaintiff has provided no evidence of
     this statement, nor evidence of his attempt to secure the nurse as a witness.  (Id. at ¶ 41.)  The
24   alleged nurse's statement is inadmissible hearsay, and could not be used as evidence.
     Furthermore, assuming arguendo that a nurse did make this statement, plaintiff has also provided
25   no evidence to contradict defendant Wolf's statement that his specific decision to terminate
     plaintiff's interferon treatment was based on the viral load count and side effects, and not on cost.
26   (Defendants' Exhibit J, at 7.)

1  admissible evidence in support of this assertion.  Plaintiff also provides no evidence that

2  defendant Wolf's decision was anything other than an exercise of medical judgment.

3          After a careful review of the entire record herein, the court finds that plaintiff's

4  claim against defendant Wolf amounts to nothing more than his own disagreement with

5  defendant Wolf's decision to discontinue the interferon treatment.  Plaintiff's personal

6  disagreement with defendant Wolf's medical judgment in terminating his interferon medication

7  is insufficient to establish deliberate indifference.  See Jackson, 90 F.3d at 332.  Defendant Wolf

8  is therefore entitled to summary judgment from plaintiff's Eighth Amendment claim.

9          B.  State Law Claims Under Cal. Const. art.1, § 17[8]

10          Article 1, Section 17 of the California Constitution states, "Cruel or unusual

11  punishment may not be inflicted or excessive fines imposed."  This section is a state equivalent

12  to the Eighth Amendment.  (See In re Alva, 33 Cal.4th 254, 291 (2004) (stating, "We see no

13  basis to find a different meaning of 'punishment' for state purposes than would apply under the

14  Eighth Amendment.")  Defendants did not address this claim in their motion for summary

15  judgment.  Because this court finds that all defendants except Brown and McArthur are entitled

16  to summary judgment on plaintiff's Eighth Amendment claim, the court will make similar

17  recommendations on this claim.

18  _____        In accordance with the above, IT IS HEREBY RECOMMENDED that summary

19  judgment be granted in part and denied in part as follows:

20          1.  Summary judgment be granted for defendants Dr. Bresler, Dr. Iway, Dr.

21  Hoffman, Dr. Sargent, Dr. Wu, Dr. Yee, and Dr. Wolf on plaintiff's Eighth Amendment claim

22  and plaintiff's claim under Cal. Const. Art. 1, § 17; and,

23  _____

24          [8] Plaintiff raised two additional state claims under Cal. Govt. Code § 844.6 and Cal.
Const. Art. 1, § 7.  Cal. Govt. Code § 844.6 discusses the liability for public entities, particularly
regarding the malpractice of employees engaged in the one of the healing arts under state law.

25  As plaintiff has named no public entity as a defendant, this statute is not implicated in this case.
Cal. Const. Art. 1, § 7 discusses due process and equal protection, pupil school assignment or

26  transportation, and privileges and immunities, and is not implicated by the facts in this case.

1    2.  Summary judgment be denied for defendants Dr. Brown and Dr. McArthur on

2    plaintiff's Eighth Amendment claim and plaintiff's claim under Cal. Const. Art. 1, § 17.

3    These findings and recommendations are submitted to the United States District

4    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5    days after being served with these findings and recommendations, any party may file written

6    objections with the court and serve a copy on all parties.  Such a document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8    shall be served and filed within ten days after service of the objections.  The parties are advised

9    that failure to file objections within the specified time may waive the right to appeal the District

10   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11   DATED:  July 25, 2006.

12

13   UNITED STATES MAGISTRATE JUDGE

14

15   17

16   youn0951.57