IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALBERT YOUNG,

    Plaintiff,                                No. CIV S-03-0951 FCD JFM P

    v.

PETER BRESLER, et al.,

    Defendants.                      <u>FINDINGS & RECOMMENDATIONS</u>

                                /

Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that defendants Brown and McArthur violated his rights under the Eighth Amendment by acting with deliberate indifference to his serious medical needs by failing to timely inform plaintiff of his Hepatitis C infection and treat him for this disease. Plaintiff also raises a pendent state law claim under Cal. Const. Art. 1, § 17, arising from the same set of facts. This matter is before the court on defendants' renewed motion for summary judgment.[1]

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[1] By order filed September 15, 2006, summary judgment was previously granted to defendants Dr. Bresler, Dr. Iway, Dr. Hoffman, Dr. Sargent, Dr. Wu, Dr. Yee and Dr. Wolf on plaintiff's Eighth Amendment claim and plaintiff's claim under Cal. Const. Art. 1, § 17.

1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On September 15, 2003, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

/////

ANALYSIS

I. Facts[2]

    1. Plaintiff had a history of intravenous drug use many years prior to incarceration. The exact date plaintiff contracted HCV is unknown.[3]

    2. On September 15, 1988, another physician ordered labwork that showed plaintiff had elevated levels of asparate aminotransferase (AST) and alanine aminotransferase (ALT), which are enzymes mainly found in the liver. At that time, plaintiff's AST count was elevated at 46, and his ALT count was elevated at 68.

    3. On February 4, 1992, various diagnostic tests revealed an elevated AST count of 51 and an elevated ALT count of 82.

    4. On February 20, 1992, other liver function tests in plaintiff's SMA-12 diagnostic were normal, despite the elevated AST and ALT results.

    5. On May 22, 1992, plaintiff was seen for hypertension, and a thyroid panel tested essentially normal; during this time, a hepatitis C test was available and could have been performed; however, no interferon treatment for hepatitis C was available.

    6. On April 23, 1993, plaintiff tested positive for tuberculosis during an annual tuberculosis test. Plaintiff received prophylactic therapy for tuberculosis for six months, which included a medication called INH. INH is a drug that can damage the liver and increase AST levels in a patient. Plaintiff began the INH treatment on June 15, 1993.

---

[2] Unless otherwise noted, these facts are undisputed. More detailed facts are set forth in this court's July 26, 2006 Findings & Recommendations (F&Rs).

[3] Previously this court found it was undisputed that on February 15, 1983, an unknown physician, who is not a defendant in this action, completed a CDCR Periodic Health Review form for plaintiff, which stated that plaintiff had a "history of hepatitis or syphilis." (July 26, 2006 F&Rs at 4-5.) However, Dr. Koretz points out that this reports "plaintiff's summary of history that Mr. Young provided to the interviewer." Koretz Report at 5. Dr. Koretz read the report as stating plaintiff "denies hx (history) hepatitis or syphillis (sic). . ." Id. The court has reviewed the form dated February 15, 1983, and, although the word "Denies" is written in poor handwriting, agrees with Dr. Koretz' interpretation. (See Ex. 1 to Pl.'s February 28, 2006 Declaration in Opp'n [docket no. 72].)

7. On June 18, 1993, plaintiff had an elevated AST count of 52.

8. On August 12, 1993, defendant Brown first followed up with plaintiff, noting the results of the June 18 test and that plaintiff had only received two doses of the INH in June. Defendant Brown did not order further blood tests during this time because Dr. Iway had ordered the monitoring of plaintiff's liver from the INH medication for tuberculosis, and plaintiff stopped taking the INH on August 17, 1993.

9. On October 26, 1993, plaintiff had an elevated AST count of 70.

10. In September 1997, the CDCR issued treatment guidelines for chronic viral hepatitis, including procedures for determining a patient's qualification for treatment. The only known treatment at that time was Interferon Alpha, which was successful in 10 to 15 % of patients, and caused significant side effects.

11. On November 26, 1997, Dr. Robertson ordered plaintiff to be tested for HCV. (Opp'n., Ex. 4.)[4] At that time, Interferon Alpha treatment was available.

12. On July 27, 1999, September 28, 1999, and October 10, 1999, defendant Brown treated plaintiff for hypertension and trigger finger, noting that plaintiff had been without blood pressure medication at times. (Id. at ¶ 43-45.) On March 21, 2000, defendant Brown treated plaintiff for trigger finger, referred him to an optometrist for an eye problem, and ordered lab tests, including a test for hepatitis.

13. The tests, dated March 25, 2000, showed that plaintiff had an elevated AST count of 53 and an elevated ALT count 55, and the hepatitis panel was positive for hepatitis B core antibody, and hepatitis C AB.

14. On March 29, 2000, defendant Brown noted that plaintiff had tested positive for the hepatitis C virus (HCV) and had elevated AST and ALT levels. He ordered a PCR viral

---

[4] Plaintiff claims Dr. Robertson ordered Dr. Brown to test plaintiff for HCV and cites his exhibit 4 as evidence. Exhibit 4, however, is a form called "Physician's Orders" that reads: "Book for Flex Sigmoidoscopy" "Hepatitis C antibody" with a signature below that does not appear to be either Dr. Robertson's or Dr. Brown's.

load test, which determines the number of viral RNA particles per milliliter of blood, and liver function tests (LFTs). An HCV RNA quantitative test, performed on March 31, 2000, showed plaintiff's viral load to be 354,850 copies/ml (reference range less than 550 copies/ml.)

15. On April 11, 2000, an unknown physician diagnosed plaintiff with hypertension in poor control, and ordered plaintiff to increase his medication and return to the clinic in a week.

16. On April 13, 2000, defendant Brown noted the results of the PCR viral load test, and noted that he wanted to meet with plaintiff to discuss a liver biopsy and his possible candidacy for treatment. A liver biopsy is a necessary precursor to treatment to determine whether a patient has bridging necrosis or severe cirrhosis, which would exclude the possibility of Interferon treatment. Plaintiff did not appear at three subsequent meetings with defendant Brown scheduled for May 8, 2000, May 15, 2000, and May 25, 2000.[5] However, physician's progress notes demonstrate plaintiff presented for blood pressure checks on April 2, 2000, May 20, 2000, June 3, 2000, June 10, 2000, June 28, 2000, October 14, 2000, and October 28, 2000. (Opp'n., Ex. 14.) Plaintiff failed to show for these blood pressure checks on January 21, 2001, and January 28, 2001. (Id.) He was checked again on February 11, 2001, but missed appointments on February 18 and 25, 2001 because of lock downs. (Id.)

17. Based on the CDCR treatment guidelines, defendant Brown determined that the poor control of plaintiff's hypertension, his lack of compliance with treatment orders, and his failure to appear for the necessary liver biopsies were criteria which excluded him as a good candidate for treatment at that time. Defendant Brown did not refer plaintiff's case to either the Medical Authorization Review Committee (MAR) or the Health Care Review Committee

---

[5] Plaintiff contends that the Guidelines required Dr. Brown to tell plaintiff he wanted to meet with him to advise him of the liver biopsy and discuss treatment, but the Guidelines do not require the doctor to inform the patient about said details prior to meeting with the patient. Plaintiff also contends that Dr. Brown cited different dates in his answers to interrogatories, March 21, 29 and April 13, 2000, rather than May 8, 15 and 25, 2000. In any event, the actual dates of the missed appointments are irrelevant to this court's analysis.

6

(HCR). Defendant Brown additionally did not, during this time, inform plaintiff either of his hepatitis C positive condition, or that he had been tested for hepatitis. On March 1, 2001, plaintiff was transferred to FSP.

18. On March 12, 2001, at FSP, defendant McArthur diagnosed plaintiff with hypertension and possible degenerative disc disease. On July 25, 2001, defendant McArthur treated plaintiff for pain in his left shoulder and arm, diagnosed him with hypertension and possible coronary artery disease, noted that he had not taken his medication for more than 30 days, and ordered "fasting chem and lipid panels" and hypertension medications. The tests showed that plaintiff had an elevated AST count of 56 and an elevated ALT count of 58. Defendant McArthur did not see the results of these tests as follow up was done by Dr. Cardeno. Defendant McArthur did not further handle plaintiff's medical care.

19. On April 22, 2002 plaintiff met with Dr. Torruella, who reviewed plaintiff's medical file and informed plaintiff he had HCV. Plaintiff told Dr. Torruella that this was the first time he had been so advised.

20. Plaintiff was tested for HCV on April 24, 2002, and diagnosed with HCV on May 8, 2002. (Opp'n, Ex. 5.) Plaintiff's HCV genotype was 1a. Genotype 1a is the least responsive to treatment.

21. On June 27, 2002, plaintiff had a telemedicine consultation with Dr. Jameson, who believed plaintiff had chronic acute hepatitis C, type 1a, and recommended that combination therapy not be started at that time because FDA approval of combination therapy with pegylated interferon with ribavarin was pending. The new combination therapy had a higher response rate (35-40 % of patients with genotype 1a) than the non-pegylated interferon. Plaintiff agreed with this recommendation, and Dr. Jameson ordered a follow up in four months and an ALT test.

22. On October 7, 2002, plaintiff had his follow up telemedicine consultation with the Internal Medicine Clinic, and his September 19, 2002 ALT test showed an ALT level of 49, which was within normal range. Another four month follow up appointment and ALT test

were scheduled. On February 24, 2003, plaintiff met with defendant Wolf for his follow up telemedicine consultation, and his February 3, 2003 ALT showed an elevated ALT count of 57. At this time, defendant Wolf recommended a liver biopsy to stage the disease.

23. On July 21, 2003, plaintiff received a liver biopsy which showed chronic hepatitis C, grade 2-3, stage 3, and a "possibility of an evolving cirrhosis."

24. Plaintiff was treated with pegylated interferon/ribavirin combination therapy for HCV on November 3, 2003, received follow-up visits on December 22, 2004, January 5, 2004, and February 6, 2004.

25. Plaintiff experienced several side effects from the treatment including fatigue, pain, constipation, decreased concentration, anxiety, and itching.

26. Plaintiff's treatment was terminated by Dr. Wolf on February 6, 2004.[6]

II. Plaintiff's Claims

    A. Eighth Amendment[7]

In order to prevail on his Eighth Amendment claim, plaintiff must prove that he had a "serious medical need" and that defendants acted with "deliberate indifference" to that need. Estelle v. Gamble, 429 U.S. 97, 105 (1976). A medical need is serious if "the failure to

---

[6] Dr. Wolf contended that medical evidence indicated that, if treatment is non-responsive after twelve weeks, there is little or no chance that further treatment will be successful and the treatment is discontinued because the serious side effects of combination therapy outweigh any probability of success. (Defts.' Ex. J filed 12/20/05, Resp. No. 12.) Because plaintiff's viral load count had not decreased by 100 fold (2 log drop) and plaintiff was experiencing significant side effects from the interferon, Dr. Wolf considered the treatment to be a failure and discontinued plaintiff's treatment. (Id.)
  Dr. Wolf explained that plaintiff's viral loads at 12 weeks did not show undetectable levels of the virus or a 2 log drop in the viral load. (Defts.' Ex. J, Resp. No. 13.) His viral load in May 2002 was 1,712,300. A 2 log or 100 fold drop from that number would have resulted in a viral load of 17,000. Id. Without treatment, plaintiff's viral load had decreased to 892,300 by October 2003, shortly before treatment with combination therapy was started. Id. A 2 log drop from that number would have been 8,923. Id. Two viral loads done after 12 weeks of treatment were 70,970 and 96,810. Id.

[7] Defendant Brown was granted summary judgment as to his failure to diagnose plaintiff's HCV infection on August 12, 1993. (July 26, 2006 F&Rs at 20-21.)("constituted at most negligence, which does not rise to the level of deliberate indifference.")

8

treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain'." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992) (quoting Estelle, 429 U.S. at 104, 97 S.Ct. 285). Deliberate indifference is proved by evidence that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Mere negligence is insufficient for Eighth Amendment liability. See Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

Whether a defendant had requisite knowledge of a substantial risk is a question of fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious. See Farmer, 511 U.S. at 842. While the obviousness of the risk is not conclusive, a defendant cannot escape liability if the evidence shows that the defendant merely refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. Id. Deliberate indifference specifically to medical needs "may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003).

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted). However, delay in providing medical treatment to a prisoner does not constitute deliberate indifference unless the delay causes substantial harm. See Shapely v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 407 (9th Cir. 1985). Additionally, "a plaintiff's showing of nothing more than 'a difference of medical opinion' as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (as amended) (1996).

/////

Because it is undisputed that defendant Brown had actual subjective knowledge of plaintiff's HCV positive condition on March 29, 2000, the only issues in dispute after that date are whether defendant Brown's delay of treatment constituted deliberate indifference to plaintiff's HCV infection, and whether any cognizable harm accrued to plaintiff as a result of this delay. This court previously found that triable issues of fact remained as to defendant Brown:

> A reasonable jury could conclude that defendant Brown's failure to inform plaintiff and persist in following up regarding his HCV infection, and his failure to refer the case to the MAR or HCR committees for evaluation, constituted deliberate disregard of a known risk to plaintiff's health. Therefore, the court finds that triable issues of material fact exist as to whether defendant Brown's delay in providing medical treatment for plaintiff's HCV infection constituted deliberate indifference to plaintiff's serious medical need. See Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002).

(July 26, 2006 F&Rs at 22.) In addition, this court found that

> a reasonable jury could conclude that the delay in diagnosis allowed for the substantial increase in plaintiff's viral load before he received treatment, and that this may have contributed to the poor response. Plaintiff's evidence is sufficient to create a triable issue of material fact as to whether defendant Brown's delay in treating plaintiff's HCV infection in 2000 caused plaintiff substantial harm.

(Id. at 23.)

As to defendant McArthur, it is undisputed Dr. McArthur treated plaintiff on March 12, 2001 and July 25, 2001, and that plaintiff's medical record at those times contained the results of the March 21, 2000 test showing that plaintiff was HCV positive. The record also shows that defendant McArthur did not inform plaintiff of his HCV positive condition, did not pursue any course of treatment for plaintiff's HCV infection, and did not refer plaintiff to the MAR or HCR committees for evaluation of his HCV. This court previously found:

> Because defendant McArthur took no action toward further testing or treating plaintiff's HCV infection, a reasonable jury could conclude that defendant McArthur delayed medical treatment for a known risk to plaintiff's health. Plaintiff's evidence is sufficient to create a triable issue of fact as to whether defendant McArthur

> was subjectively aware of plaintiff's HCV infection, and whether her failure to inform plaintiff of his infection or pursue any course of evaluation or treatment constituted deliberate indifference to plaintiff's serious medical need. See Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002).

(Id. at 24.) In addition,

> plaintiff provided evidence from which a reasonable jury could conclude that a timely diagnosis and immediate treatment could have prevented additional harm, and that the delay in diagnosis and treatment may have contributed to the subsequent failure of that treatment. Plaintiff's evidence is sufficient to create a triable issue of material fact as to whether defendant McArthur's delay in pursuing further testing or treatment for plaintiff's HCV infection on March 12, 2001, and July 25, 2001, caused plaintiff substantial harm.

(Id. at 24-25.)

However, defendants have provided the expert declaration of Ronald L. Koretz, M.D., who opined that:

> Mr. Young was treated with pegylated interferon/ribavirin combination therapy in 2003 and failed to respond. That failure was not unexpected because all the prognostic factors, except his viral titer, were not favorable to successful treatment. Because Mr. Young failed pegylated interferon/ribavirin combination therapy in 2003, I can say with a high degree of medical certainty that his outcome from treatment with a less efficacious treatment regimen in 2000 would have been the same, so that any putative delay in treating him caused no harm. Therefore, it is my expert opinion that the medical treatment provided by Dr. Brown and Dr. McArthur to Mr. Young was within the standard of care for treatment of hepatitis C and that their conduct and any putative delay in treatment did not cause Mr. Young's failure to respond to pegylated interferon/ribavirin combination therapy. There, it is my opinion that Dr. Brown and Dr. [McArthur] were not deliberately indifferent to Mr. Young's serious medical needs.

(Id. at 2 (Ex. A to Defts.' MSJ filed January 6, 2009).)

Plaintiff claims the use of alpha interferon was approved for HBV and HCV on September 4, 1996, before defendants claim treatment became available in 1997. (Pl.'s Ex. 7.) He also claims HCV Guidelines dated May 27, 1998 provide that prisoners should receive interferon alpha therapy. (Pl.'s Ex. 6.)

11

The HCV Guidelines, however, do not require the use of interferon alpha therapy. Policy E states "[t]hese guidelines are intended to assist the practitioner, but as always, guidelines are not a substitute for exercising good clinical skill and judgment" and warns that

> [c]hoosing treatment options for patients with chronic viral hepatitis requires medical judgment since information gained from the studies do not correlate well with the histopathology. In addition, this field of medical practice is new and is rapidly changing as new techniques and therapies are developed. The will continue to be periodically updated, consistent with the principles of medical practice.

(Pl.'s Ex. 6 at 2.)

Moreover, even if the treatment were available earlier, plaintiff has not demonstrated, by expert medical opinion, that he would have been provided the treatment. Indeed, plaintiff's exhibit 7 states: "Presence of any one absolute exclusion criteria will preclude treatment during incarceration." (Pl.'s Ex. 7 at 63.) Poor control of hypertension was listed as an absolute exclusion criteria. (Id. at 62.) The record demonstrates plaintiff suffered from hypertension (July 26, 2006 F&Rs at 5, 8 & 10), and confirms it was poorly controlled at various times. (Id. at 8 (without blood pressure medicine at times); 9 (in poor control); 9 (had not taken blood pressure medication over 30 days). Plaintiff was to have his blood pressure checked on a regular basis. (Opp'n., Ex. 14.) Plaintiff does not dispute that his blood pressure was not well controlled, but argues he couldn't bring himself into compliance regarding the hypertension medications unless doctors told him that was required in order to get the treatment. (Opp'n. at 7.)

Plaintiff contends he "was benefitting from the interferon and ribavirin therapy" (opp'n. at 10), because the Guidelines state treatment can result in remission of the clinical symptoms, and during his treatment, his viral load count dropped from 892,300 to 96,810 copies/ml which demonstrates a benefit from the treatment, and he wasn't feeling too badly from the side effects, and was taking medications to curb the side effects. (Opp'n. at 10.) However, he has failed to provide an expert opinion supporting his lay conclusion that his viral load test

results alone demonstrate he was benefitting from the treatment. Moreover, he has failed to rebut, with expert medical testimony, defendants' expert opinion that his viral load had not sufficiently dropped, or that the combination therapy failed.

Finally, plaintiff argues that because there is no way to predict which HCV patient will develop cirrhosis or will respond to medical therapy, that defendants cannot definitively state that the outcome would have been the same whether plaintiff had been treated with standard interferon ribavirin in 2000 instead of waiting for the combined pegylated interferon and ribavirin treatment in 2003. (Opp'n. at 11.) "There was a more likely chance plaintiff would have responded to therapy." (Id.) Plaintiff claims that "if a person with a serious illness (in this case an infected liver), [is] identified early, he can receive treatment and the disease can be cured or can be arrested. In certain instances, early detection of some forms of cancers can be cured if caught at the beginning of the illness." (Id.) However, plaintiff does not support this lay conclusion with an expert medical opinion. Review of the instant record demonstrates that HCV presents complex questions regarding appropriate medical care.

Moreover, the report of Kevin D. Stuart, M.D., filed by plaintiff on January 8, 2009, also supports Dr. Koretz's opinion:

> the delay in diagnosis did not materially affect the outcome of his disease. I state this because Mr. Young had every unfavorable factor for not responding to treatment that an individual can have. They are: genotype 1, high viral load, African-American, and long duration of disease (first use of IVDA at the age of 23), advanced fibrosis (scarring). . . .

(Dr. Stuart Report at 2 (appended to Pl.'s Request, filed January 8, 2009, Ex. 12 at 35-37). Dr. Stuart also opined that:

> The fact that [plaintiff] did not respond to the best treatment available further supports that an earlier diagnosis and treatment would not have been effective as the treatments available prior to 2001 were marginally effective for patients with Mr. Young's profile. In fact, the most recent studies using current treatment involving African-Americans show a response rate of only 19% compared with 52% in non African-Americans. One could

> potentially argue that if he had been diagnosed earlier, he would have had less fibrosis, and therefore more likely to respond to treatment. However, as stated, the only medication he had any reasonable chance of responding to was not FDA approved until 2001. The period between FDA approval and Mr. Young receiving it [in 2003] was not such that the severity of his liver disease would have progressed significantly.

(Id.)

Thus, although plaintiff suffered a delay in medical treatment from 2001 to November 3, 2003, when the combination treatment began, plaintiff has failed to demonstrate that said delay caused substantial harm. Accordingly, defendants Brown and McArthur are entitled to summary judgment.

State Law Claims Under Cal. Const. art.1, § 17

Article 1, Section 17 of the California Constitution states, "Cruel or unusual punishment may not be inflicted or excessive fines imposed." This section is a state equivalent to the Eighth Amendment. (See In re Alva, 33 Cal.4th 254, 291 (2004) (stating, "We see no basis to find a different meaning of 'punishment' for state purposes than would apply under the Eighth Amendment.") Under California law, the standard of care in medical malpractice cases can be proven only with expert testimony. Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988). Defendants have provided an expert declaration confirming that defendants' conduct fell within the community standard of care. (December 20, 2007 Decl. of Ronald L. Koretz, M.D. [Docket No. 107-3].) Plaintiff provides only his lay opinion in opposition. Accordingly, defendants are entitled to summary judgment on plaintiff's state law claim.

In accordance with the above, IT IS HEREBY RECOMMENDED that summary judgment be granted for defendants Dr. Brown and Dr. McArthur on plaintiff's Eighth Amendment claim and plaintiff's claim under Cal. Const. Art. 1, § 17, and this action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 26, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

001; youn0951.msj2